Robinson v. Department of Veterans Affairs. That's Appeal 7096 from 2008. On our three-case argument list, we'll hear argument first in Appeal 1281 from 2008, Royal Thai Government v. United States. Mr. Garish, good morning to you. Welcome to the Court. Please proceed. Thank you, Your Honor. May it please the Court, I am Jeff Garish of Skadden Arps, appearing on behalf of the United States Steel Corporation. This case presents a very simple issue. Now, I know that you probably wish that you had a dollar for every time that someone like me stood up here and told you that, but let me tell you why I think that that is the case. The issue in this case is whether the Department of Commerce used an appropriate benchmark rate to measure the benefit to steel producers in Thailand from their receipt of import duty reductions and exemptions on imports of slab. Commerce used a 1% import duty rate as the it could not identify an alternative rate that would have applied to slab absent the 1% rate. What does it mean to identify an alternative rate? Well, Your Honor, Commerce had to determine whether the 1% rate that it had originally selected as a benchmark was itself a countervailable subsidy. Now, to do that, it had to determine whether the 1% rate was specific, provided a financial contribution, and provided a benefit. Now, it determined that it was specific, so what it had to do then is determine whether it provided a financial contribution and a benefit. To do that, it had to determine whether there was an alternative import duty rate to compare to the 1%. How does one know whether it's an alternative rate? What do you look at to determine that? Well, in this case, it had before it notifications issued by the Ministry of Finance of the Thai government, and those showed that what the import duty rate was for imports of slab. Now, what happened in this case is... Well, I thought the relevant Thai government documents for the year in question showed two rates, 10% and 1%. And as I recall, Commerce determined that the 10% was not realistic, not useful as a benchmark because, in fact, it hardly ever pays the 10%, and that therefore, in effect, by default, the rate that should be used is the 1% rate. That's an actual rate. Now, you seem to be saying, no, instead of the actual rate, the benchmark rate should be the rate from the prior year, which was 5%. Well, it is the rate that was applicable in the prior year, and in fact... But how is that an alternative rate for the year in question if it was the actual rate for the prior year? Well, in fact, though, it was not just the actual rate for the prior year. What these Ministry of Finance notifications, and there were three of them, in effect, indicated was that in the absence of the 1% rate, a 5% rate... Well, you keep on going back to the MOF notifications, which is what you rely most heavily on, but Commerce's view is that those notifications aren't reliable, and it looks like Commerce ended up being right in this case because the rate never returned to 5%, right? That's right. It did never return to 5%. Are you suggesting that Commerce is required to rely on these notifications even if it correctly believes that they're not viable or not reliable? Well, I think there's other evidence that also supports the fact that the 5% rate would have applied in the absence of the 1% rate. And yes, in the future, that 1% rate was extended by the Ministry of Finance. Well, what do you mean would have applied? We're just going around in circles on semantics. Under what circumstances would it have applied? What do you mean would have applied? It's a tautology thing. If they hadn't changed it, it would have stayed the same. Well, that doesn't tell us anything useful. Well, Your Honor, in fact... We don't have here a basket provision that's a default provision that this would fall into, right? Well, in fact, what happened here is... No, no, no. What's the answer? Do we have... I'm familiar with US tariff schedules and their contentions. Well, it can fall within this specific schedule, and if it doesn't fall within that, there's this basket provision that it does fall into. There's no such basket provision here under Thai law, right? No, there is not, Your Honor. So, in fact, what we're trying to determine is what kind of provision the Thai government would enact or create to cover this product. It's not as though there's an existing category, right? Well, in fact, the slab was reduced temporarily to 1%. Now, what the Ministry of Finance himself said was it would return to the 5% rate. And, in fact, if you look... And, unfortunately, this information is business proprietary, and I can't discuss it publicly here, but I would... That's a purge, Your Honor. You're going to come into court, you got to be able to discuss what the provisions say. I'm having trouble seeing what the Thai government said is confidential. Well, actually, what they said in the Ministry of Finance notifications is not confidential. Well, show us where in the Ministry of Finance notifications they said that there was an existing rate. Because I thought you said there wasn't an existing rate. Well, there is no basket rate, Your Honor, that would apply to slab. I mean, there was a specific tariff heading, and it provided for a reduction to 1% temporarily because the government found that there was not any domestic production of slab. But there was always the provision that it would return to 5%. If there was created a domestic slab industry? Well, that's correct, Your Honor. I think... So it would be for one year if within that year a domestic industry were created, but it could be permanent if a domestic slab industry were Regardless of whether a domestic industry started up? Well, the Thai Ministry of Finance notifications themselves say as of a specific date, it will return to the 5%. Okay. Under what circumstances? It doesn't say. It does not, Your Honor. Well, the first that I'm looking at is a JA-133, Your Honor. And that's the first of the notifications which was issued in May of 1998. And it specifically says that imports up to December 31, 1999 will have the 1% rate, but that imports after that date will have the 5% rate. Let me ask you this. Is it critical to your case, critical to you prevailing in this appeal, that the rates were expected to go from 5% to 1% back to 5%? I think that's a key fact here, Your Honor. Now, what also... If the return to 5% from 1% is a critical part of your case, then I don't understand your answer to Judge Probing's question. Congress said it was totally unpredictable what it would return to or when, and therefore, they couldn't rely on that statement in the Ministry of Finance notice that suggested that it would go back to 5% in a year or so. Well, I think two things that I would point out to you, Your Honor. And one thing is, on the confidential information, and I know it's... Don't change the topic. Okay, sure. The question is, Congress said it's too unreliable, too unpredictable. They said it'll go back to 5%, but it might or it might not. Therefore, we can't use 5%. And your answer to that is exactly what? Two things, Your Honor. First of all, you have to look at what Congress has said on this as well. They've said in other contexts on this in the very same case. And it's very different from what they're saying now in this remand determination. In a brief to the Court of That's just a description of the document, and it's an accurate description. That is what the document said. But Congress is saying here, in this case, those predictions are unreliable, so we can't use them. And I don't understand what your response to that is. Are you saying, yes, they are reliable? Or you're saying it doesn't matter whether they're reliable? No, in fact, Your Honor, they are reliable. Well, in this case, they turned out to be not reliable because it didn't go back to 5% in year two or in year three or in year four. As a matter of fact, it went down from one to zero rather than going back to five. So it was the opposite of reliable, in fact, in this case. Well, I guess two things. First of all, I think they were continually extended. But at the time that these provisions, these MLF notifications, were issued, they were reliable. They said what the rate was going to be. They didn't say that it would return to 5%. If I'm reading these correctly, where does this document say it would return to 5%? It says in the future it will be 5%, but it doesn't say return to 5%, does it? Well, actually, the notifications themselves are just in chart form. They simply say, as of a certain date... Is there a Thai government document that says it will return to 5% or does it just say it will become 5% on a certain date? Well, there isn't a Ministry of Finance document which says it will return to 5%. I think that in the course of this proceeding, the Thai government has said that it would return to 5%. We have no official document which says it will return to 5%. So under those circumstances, it looks to me, as Chief Judge Michel was suggesting, that we're talking about the prediction of a future rate rather than the elimination of a current beneficial rate and return to something higher. Well, again, I do think that the... Why is that wrong? Well, I think the entire time here, the understanding was, even when these companies were applying for this 1% rate, that it would return to the 5% rate. What does that mean, that it was the questions or these MOF notifications? Beyond that, how are we supposed to give credence to what the understanding was? And I know it's frustrating, but I would have to ask you to look at the confidential record on that. There are documents on the confidential record which show what the understanding was, and I just... How can that be confidential? What's confidential about the statement about what will happen to the rates? Your Honor, I share your frustration. Unfortunately, this is a document that was... These are documents that were provided in the context of this proceeding under the protections of the Administrative Protective Order. I can't... These are not my documents. I can't disclose what is in them. I want you to agree with the other side to make them public. There are often orders by administrative agencies or district courts that are far too broad in terms of maintaining confidentiality. The parties can agree that that was a mistake. It doesn't need to be that way. Can you help me understand why your proposed 5% is a better benchmark rate than the commerce-selected 1%? Well, again, I think that this is a rate that is a non-subsidized rate. How do we know that? Okay. Well... That's just what you say, but how do we know that? What can I look at to deduce that when it went from 5 to 1, that was a 4% subsidy? Well, the reason it's a 4% subsidy, Your Honor, is you look at... You compare the 1% rate to the 5% rate. You determine that, in fact, the Thai government would have collected less in import duties as a result of it going down to 1%. Well, of course. That's obvious. Maybe the 5% was a mistake. So they corrected their mistake. They made it 1%, which is what it should have been all along. Are they somehow stopped from doing that? I don't think they're stopped from doing that, Your Honor, but that... Then why is 5% better than 1% other than you say so? Well, it's just a matter of under the countervailing duty law, the Department of Commerce is tasked with measuring whether a rate that's provided is a preferential rate to the particular company. Well, does that mean that any time a tariff rate goes down, it's automatically a subsidy? Not necessarily, Your Honor. They have to meet the... Then why do we know in this case that the reduction from 5% to 1% for the import of the precursor steel slab material was a subsidy other than you say so? Well, you look at the three requirements of what constitutes a countervailable subsidy. You look at whether it's specific, whether it provides a financial contribution, whether it provides a benefit. Now, commerce, in your example, Your Honor, in most instances, a reduction in an import duty rate is not going to be specific to particular industries or companies. It might or it might not. It's a choice of the sovereign state. Well, exactly, Your Honor. But that's the countervailing duty law is designed to address that. And when it is specific, then that's one of the criteria that are met. And then you look to see whether it provided a financial contribution and a benefit. In this case, commerce found that it was specific. So their task was to find whether it was a financial contribution or a benefit. To do that, you have to see what rate would have applied or could have applied in the absence of this rate to see whether it was lower, that the given rate was lower and therefore provided a financial contribution in the form of duties foregone and a benefit in the form of duties that didn't have to be paid. I still don't really follow your argument. You've now reverted to the same phraseology of would have been. What would the rate would have been? We don't know what it would have been. We know what it was last year, 5%. We know it is the year in question, 1%. So why do we deduce that it would have been 5%? I don't know what it means to say would have been. Well, again, this rate was reduced temporarily. And that's what the government said that it was doing. It was reducing it temporarily. But if it were permanently reduced, what difference would that make? Well, then I think the evidence would be different and could show that, in fact, there wasn't an alternative. Where does it say it will be reduced temporarily? Well, this is, again, in the course of the proceeding here, and the Thai government has explained that it was being reduced temporarily. And in fact, that's what the government covered. So there's no official contemporaneous document that says it's a temporary reduction other than this document which says that in the future it's going to be increased. Now, I don't know that there are any official Ministry of Finance documents which indicate that it's being reduced temporarily. But I think by the nature of the MOF notices themselves, they're saying it will return to 5%. Excuse me. And, you know... Is it not the case that the rationale for lowering the rate was that there was no domestic slab industry and therefore all steel makers in Thailand who needed slab as a precursor would necessarily have to import it from other countries? That is correct. That's why the rate was reduced to 1%. Wouldn't that suggest that as long as there failed to be a domestic industry, the new lower rate would continue, possibly indefinitely, possibly permanently? Well, I think the Thai government did this temporarily as a measure to help the steel industry. But the fact is there was no slab industry before this went into effect either and the 5% rate applied. Maybe that's why they could have considered their 5% rate an error because it failed to take into account the lack of a domestic industry. And when they focused on that, they lowered it. It would keep it lower unless and until a domestic industry started up. But, you know, that's not what the MOF notifications themselves say. What they say is it will return to 5% on a certain date. I thought you just agreed to say return. So now you're trying to put it... I'm sorry. Well, it says that it will be the 5% rate at a certain date. Well, it's interesting, though, what the Thai respondents have said about this and what they said closer in time to the period of investigation in question here. And this is from the rebuttal brief in the original investigation. And I'm quoting here. All the MOF notification 7-2541 demonstrates. That's the one I was mentioning earlier and we were talking about. All that that demonstrates is that after the time period for which the 1% duty rate applied, the duty rate would be 5%. And once that 5% rate is scheduled to be in effect, there is no express time period limiting its applicability. This is the Royal Thai government, who's one of the parties here saying this. So they are clearly saying that the rate would be 5%. Well, obviously, they're not binding themselves as to their future conduct, because in fact, in the subsequent years, they didn't put it at 5%. They kept it at 1% and eventually, after several years, lowered it to zero. So what is it other than a guess of what they might do in the future? They're not stopping themselves, right? Right. Well, I don't think they... What's the meaning of their saying, next year, it will be X? It's a guess. Next year, it might be X. We'll have to wait and see. We'll tell you what it's going to be when we issue next year's rate. Well, I think you have to look during the period of investigation, what was known at that time, what rate would have applied at that time in the absence of the 1% rate. And based on the evidence on the record, that rate would have been 5%. Why do you say that? Because I think the DMOF notifications say that it was going to be 5%. Thai government said that it was going to be 5%. This is not speculation. We think it may be, or we're not sure. You're saying, if I'm following the logic at all, that because in 2000, the year after, it was going to be 5%, that that means in 1999, the only year we care about for this case, it would have been 5% if it weren't 1%. That is the only rate that it could have been in the absence of the 1% rate.  What's the basis for that, that 5% is the only rate it could have been? They could have chosen any rate they wanted to, right? I mean, they're not bound to go to 5%, are they? But the evidence on the record also indicates that there were only certain choices that could have applied here. There were only certain product categories and certain rates that could have applied to those product categories. Well, they could have created a new product category, couldn't they? And they can change the rate from year to year to year on the same product category. Isn't that right? But this is what the Thai government... That's the question. Isn't it correct that year to year, they can change the rate for a category or put steel slab in a new and different category with a different rate than the year before? They can always change their rates and their categories. That's exactly what Commerce said. Since they can change the rate and the category, we have no idea what they're going to do in the future. And they don't either, I guess is what Commerce is implying. But certainly, Commerce is saying, we can't tell what they're going to do in the future, so we can't rely on the predictive language in the annual MOF documents. What's wrong with that? Well, I think Commerce really had to look at what evidence was on the record and what that showed as to what the product categories were. And the fact of the matter is, regardless of what product category slab fell into, it had to have gotten a rate higher than 1%. 5%, in fact, was the lowest of the alternative import duty rates. So if anything, it would have been higher than 5%. I'm not following you. When you say 5% was the only alternative, I don't understand what you're saying. Well, I think based on the evidence that's on the record as to what those rates could have been, because those are the only rates that- We know what they were. But when you change were to could have been, you lose me. In fact, your honor, that's the only rate that it would have been, that it was, if it wasn't 1%. Because if you look at the product categories, the next highest after 1% is the 5% rate. So that is for primary products and capital goods. For 1999? Yes. That is correct, your honor. And I'm looking at the Department of Commerce's verification report at JA 3123. If you're right, then wouldn't it be the case that commerce would always have to use the higher figure from an earlier year as the benchmark? They really have no discretion. No, your honor. In fact, they could- What makes your case different? Well, in this case, you have evidence on the record clearly showing, okay, the rate was going to be this amount, or the only other possible rates are these, and the rates are given. And there could have been a situation where this 1% rate was applicable to slab, and there was no indication that it would change. What is your authority for saying commerce had to do this? What regulation, what case law, what statute, what binding authority on commerce says they had to use a higher percentage rate as the benchmark, they couldn't use 1%? Well, commerce has to determine- Based on what? Who says? Where? Yeah. Based on the statute, your honor, and under its regulations, it has to determine- What language in its regulation requires that they use as the benchmark a higher figure from last year? Well, there is nothing, your honor, that specifically says they have to use a higher rate. What is the language that non-specifically or indirectly so suggests? Well, your honor, they are tasked with determining whether the- what the Thai respondents would have paid at a non-subsidized rate. They have to determine- The Thai respondents, the Thai steel companies, received a subsidy in the form of duty exemptions in this case. Commerce then had to determine, okay, well, if they were not subsidized, what rate would they have paid? Now, they chose initially the 1% rate. They then had to determine, okay, was that 1% rate itself subsidized? They cannot use- They cannot measure the amount of a subsidy by using a subsidized rate. You seem to be saying that somewhere in their reg is a requirement that they select a benchmark that is different than the actual tariff percentage rate. What language says they have to choose something other and higher than the actual applicable tariff rate? There is nothing specifically that would say that, your honor, that they have to use something other than what applies. But the fact is, the only reason why the 5% rate did not apply here was because it was reduced temporarily to the 1% rate. We would argue to subsidize the Thai steel producers. That sounds like we have to assume the result before we can do the analysis. That doesn't sound like a very good way to proceed. We have to agree with you that they were subsidizing in an analysis that is aimed at finding out whether they subsidized. Having to assume your result doesn't seem like a fair way to do the analysis, not a neutral approach. I think commerce does have to approach it to determine- No, they don't have to assume that the 1% rate is a subsidized rate. That's why they look to see what other rates are applicable. Let's hear from the government and the other side, and we'll restore the three minutes you sought to save for your rebuttal. Thank you, your honor. Thank you. May it please the court, we respectfully request that this court affirm the Court of International Trade's decision sustaining commerce's selection of the 1% benchmark rate to calculate the import duty exemptions that the Royal Thai government conferred upon Sao Haveria on its imports of steel slab. We might have predicted that you would say that. The important question is what your basis is of saying that commerce was right in using the 1% as the benchmark, and that using 5% as suggested by U.S. Steel would have been wrong, or illegal, or illogical, or stupid, or something that would make it a non-choice. The 5% benchmark rate, your honor, or the 5% reduced rate did not actually apply during the period of investigation, which was the year 1999. We all know that. It applied the year before, and the year before, and the year before, going back five years. We know that. That doesn't automatically make it not available as a benchmark, does it? Well, your honor, the Royal Thai government explained to commerce that a Ministry of Finance notification has to be issued in order for a reduced rate to apply to a product. Therefore, any other reduced rate other than the 1% reduced rate that applied during 1999 would have required action on the part of the Ministry of Finance. The notifications that U.S. Steel cites to, as your honors recognize, merely state that the... You seem to be saying that the actual rate, which was 1%, always has to be the benchmark rate. There never can be any other or higher benchmark. Is that what you're saying? It all depends on the actions of the Royal Thai government. Yeah, but the actions here were to say for the year in question, 1999, the rate is 1%. Yes, your honor. You seem to be saying since they said the rate is 1%, that's the end of the inquiry. There can't be a benchmark rate that's 2% or per U.S. Steel, 5%. Is that your position? That's our position. There can never be a benchmark rate that's higher. No matter what. During the period of investigation, no. There can be in the future a higher rate. We're only talking about 1999. We all agreed on that much. We're talking about 1999 only. In 1999 only, there is only one reduced rate and that was the 1% reduced rate. That was the applicable rate. That was the applicable rate. But I thought benchmarks could be the applicable rate or could be a constructed rate, a fictitious rate, depending on other circumstances. Is that not right? Your honor, in this case, no. The terror system is a governmental construct and therefore we only have government set rates. There's no market test. There's no commercial test. It's what the world tied government. What if we were sitting here in 2009 and the rate had gone up to 5% and continued at 5%? Would you suggest that we should be looking at it differently with the benefit of hindsight? Well, during the period of investigation, it didn't go up to 5%. However, if it did, we would have a Ministry of Finance notification stating that it went up, let's say, in September 1999. No, but let's assume it went back up to 5% after that period. After that period. Is that not probative of anything? No, your honor. Well, under what circumstances could the 5% apply? If it were a basket provision? You agree that if it were a basket provision, you'd look to the 5%, right? Yes, your honor. And also, if a notification had subsequently been issued. And if somebody, and if they'd said, we're reducing it temporarily to 1% from 5%, then that would be proof that it would revert to 5%, right? If it's temporary, but I mean. If not, answer. If they said that, then you'd use the 5%, right? I'm not so sure, your honor. Because it says it's being temporarily reduced to 1%. So at that point in time, the 1% reduced rate applies. And so Commerce would have to undergo an analysis as to whether to determine whether a subsidy was provided by applying the 1% reduced rate. It's not so simple where if it says it's temporarily reduced to 1%, that a subsidy automatically applies. Because they would have to consult with the Royal Thai government as to how long this temporary reduction was, the length of time. There would be a lot more factor. Basically, you'd be saying that the temporary reduction was countervail. So it would be wiped out. Why wouldn't then it revert to the other one? I'm sorry, your honor. The question is whether the 1% is countervail, right? Yes, your honor. If the 1% provided a benefit of a temporary reduction, why wouldn't Commerce assume that it would then revert to the 5%? Because the 1% reduced rate was not countervail. It didn't provide. Commerce found that it didn't. That's the question. The question is if it provided a benefit, it was countervail, right? If it did provide a benefit, which it didn't. The question is whether removing the 1% rate would kick them into a higher rate than the 1%, right? Isn't that the question? Yes, your honor. I understand your question now. Thank you. If the 1% didn't apply during the period of investigation and there was no Ministry of Finance notification with regard to other reduced rates, it would automatically revert to the 10% normal rate because that was the only other rate in effect during the period of investigation. However, Commerce determined that the normal rate was irrelevant and not applicable because normal rates typically only apply to the vulnerable sectors. Are there any circumstances you can think of where, I mean, the other side is arguing that the benchmark, we're talking about what's the right benchmark, right? The other side is saying 5%. Are there any circumstances surrounding these events that you could contemplate that would have justified a 5% benchmark in this case? No, your honor. Even if the Thai government had said, we're lifting it back up to 5% the next year permanently because we think that's the... I mean, there are no circumstances in which it could have been 5%? I don't think so, your honor. The tariff rate that applies is the tariff rate that applies. Whether a different rate applies the next year is irrelevant. We're looking at the period of investigation, just the year of 1999. Here's the problem. They're arguing there are two kinds of subsidies here. Subsidy number one was lowering the tariff from 5% to 1%. Subsidy number two is having exemptions that mean you don't even pay the 1%. You only pay some small portion of 1%. You seem to be saying, well, the lowered tariff itself can never be viewed as a subsidy because it's a governmental function. They can set it at any percent they want, year to year, reset it every year, move it up, move it down, move it sideways, whatever. Therefore, it can never be a subsidy. That's your position? That is our position, your honor. It is because there are no prevailing market rates that we can compare this, the reduced tariff rate. Of course, there are no market rates because it's a governmental function. The government has a monopoly on setting tariffs. Of course, there are no private transactions you can look to. So they say, well, let's look to what the rate always was in prior years. And they say, it was 5%. That's undisputed. So they say, looks to us like it was an act of subsidization to lower it from the steady state in prior years of 5% to 1%. And I don't understand what your response to that is. Our response is, your honor, well, first of all, although we didn't appeal this issue, we don't, commerce does not typically, or commerce's practice is not to determine the non-countervailability of a benchmark rate if there is no commercial test for the subsidy itself. However, because the 1% reduced rate was affirmed by the Court of International Trade, we did not appeal this issue. With regard to your question, your honor. Your point is they shouldn't have looked to see whether the 1% was countervailable? Yes, your honor. Well, maybe you should have appealed that, huh? Well, the Court of International Trade affirmed the 1% reduced rate that we had requested in the original determination. And therefore, that's why we did not appeal the issue. But surely tariff rates can be countervailable, right?  It could be, your honor. When? I'm not so sure, your honor. I don't... Let me ask you this hypothetical. I'm the Ministry of Finance in an unnamed country. And for the last 50 years, the tariff rate for steel slab imported into my country has been 40%. And then I announced that next year it's going to be zero. Why isn't that blatantly, obviously, a way to subsidize my steel industry in my country? Your honor, there would have to be a rationale behind that reduction. And in this case, in particular, what occurred was a private industry, the Thai Federation of Industries, had notified the duty committee of the Royal Thai government that steel slab was not domestically produced in Thailand. And because all products and raw materials not locally produced in Thailand received this 1% reduced rate, therefore, the duty committee conducted its own private investigation to verify that steel slab was not domestically produced in Thailand and verified this. And after they did so, they reduced the rate to the 1% reduced rate. I think the translation of what you're saying, if I understand, is that if a country greatly lowers a longstanding duty rate for precursor materials being imported for later export to the United States, it can never be viewed as a subsidy unless they say out loud, the reason we're doing this is we want to subsidize our steel industry. And of course, no country is ever going to do that. It's too stupid. So your stance leaves every US industry completely defenseless in the face of deliberate subsidization of major proportions unless the government admits that's what they're intended. Doesn't it? But that is the problem and the issue with the tariff system. And yes, so you're saying lowering tariffs can never constitute a subsidy unless they admit that's the only reason they're doing it. Or unless there's a basket provision, right? That's correct, your honor. Anything further from the government? Nothing further, your honor. All right, thank you. Mr. Pierce. May it please the court, I'm Ken Pierce from Hughes, Hubbard & Reed, counsel for Sahabria Steel Industry and the Royal Thai government. I think this helped me understand how the Thai tariff system works. As I understand it, there are these various categories of raw materials, primary products, and there are rates for those, but those aren't actually the tariff rates. That's sort of the, as a matter of policy, that's a direction as to how the rates should be constructed. Am I understanding that correctly? In part, it's a two-step process for setting the tariff rates in Thailand or anywhere, really. First, they're negotiated in the WTO. Everybody negotiates rates down as their ceiling rates. Government, at a policy level, can have lower rates. Thailand had a rationale for lowering those rates in different types of stages, depending on whether a product was a primary product, was their local production, was it a sensitive local industry. With that, you got the six stages of rates that would apply to each product, depending on what category it fell into. It's not really helping me. What I'm trying to understand is we've got two different documents here. One that lists various rates with categories, raw materials, primary products, so on and so forth. Then we've got these specific tariff rates that apply to the slab steel. What's the significance of the broader categories? Is that just advice to the tariff-setting body within the Thai government as to the policy considerations  It is advice that you would slide the product into one of those six categories that you're mentioning. Slab, a primary product, could be at 5%, but there's the 1% rate. So the primary product category is not an actual tariff category. It's just a policy directive. That's correct. Below that, in another policy directive, if there's a product with no local production, then it gets the 1% rate. Slab fell into that, no local production. Obviously, that is, quote, temporary in the sense that local production could come along and then you would want to rethink it. Was there local production during the five preceding years where the rate was 5% for slab steel? No, there was not. There was also not. How do you explain the 5% as opposed to the 1% for those prior five years? Because there was not steel rolling production either. There was not significant imports of slab before that time. It wasn't an issue. Who was importing slab? There was no particular rolling mill that would care about it. So rolling mills are set up that need slab entirely. In about the mid-1990s, they go and they say, we need this slab. There's no local production of it. It should be at the 1% rate. MOF agrees it's at the 1% rate. But what it seems to me here, we have a situation in which the actual tariffs themselves don't have a basket provision to which the slab reverts if you say the 1% is countervail. Correct? That's correct. Right. But I think the argument is, at least in part, that we should look to these policy directives that slab is really a primary product. And so that tells us that it would have been at a 5% rate if the 1% rate were eliminated. You have to say slab is a primary product of which let's pretend there is production of slab in Thailand. You can't pretend. You're speculating. There's that other provision that the court has ordered. Show me where. Show you where. Where it says that. In the categories you referred to at the 1% rate, it says raw material. I'm looking for the page now. It says raw materials if no local production. It's in the verification report. A joint appendix 3123. 3123? 3123. Item B, raw materials not produced locally at 1%. But why is this a raw material? What happened here if I understand it is that this thing used to be treated as a primary product and then became treated as a raw material. Am I misunderstanding what happened? No, you're understanding correctly. It was slotted into the C at the 5% and then it was changed to be treated as a raw material at the 1% rate for lack of local production. So their appellant's argument that if we invalidate the 1% rate it falls back into the primary products category. What's the matter with that argument? There is still no local production of it. One, it never happened. We're talking about 1999. But the primary products category doesn't depend on local production, does it? Well, if there's no local production it should be in the 1% rate. I don't understand. Something's either a raw material or a primary product, right? Those are two separate categories. Well, and that was part of Commerce's problem with this, with using the 5% rate. The Thai government switched back and forth. The product moved. At one time it could be classified as one and another time classified as other depending on the different considerations. That's why presuming that it would go to the 5% rate is so speculative. That's why this whole debate has been about what if, what if, what if. What you're suggesting is the entire process is entirely speculative. So why is going to the 5% any more speculative than staying at the 1%? Because we know it was actually in effect in 1999 and that was the 1% rate. And we know what happened after that as well. It stayed at the 1% rate and ultimately went to 0%. I asked the government if it had gone back up to 5% and stayed there through 2009. The government said that makes absolutely no difference. Do you agree with that? What makes the difference is what was in effect in 1999, yes. So it makes no difference what happened afterwards. I think it is indicative of there that it was dependent on no local production that it stayed at the 1% rate and then went to 0%. I think what is important and what matters under the regulation what duties otherwise would have been paid was 1% in 1999. There's no question about that. Otherwise meaning if it weren't for the IPA exemptions. Correct. But that doesn't deal with their argument I don't think that the lowered rate itself was a subsidy. I don't think you can begin to say that the lower rate itself was a subsidy or that the 5% should be useful. 5%, why not 10%? Well, if it was a benefit, it was a subsidy, right? I mean, if there had been a basket provision here that brought it back to 5% if the 1% rate were rendered inapplicable that would be a benefit and it would be countervailable, right? No, not necessarily. There was no basket provision. No, no, I understand, but I'm trying to ask you a hypothetical. If there were a basket provision that said 5% then this would be countervailable, right? It would depend on the facts on how it got to the... What does that mean? It would depend on... The government admitted that it would be countervailable under those circumstances. You're disputing that? The government admitted? Yes. Which government? The U.S. government. Oh, sorry. That's usually the government we talk about. No, I'm not admitting that. It depends on the facts. When you had a basket category, how did you end up with the 1% for slab? It depends on how you got there. Oftentimes... What does that mean? I don't understand. Tariff schedules have breakouts all the time for specific products obviously in the nomenclature. An entire country's tariff schedule cannot be countervail... The numbers can always be higher by some rationale. You're saying that you cannot have countervailable tariff rates? I believe that's correct. I think you can in a drawback situation. But of course the situation we're dealing with is a drawback. No, we're not dealing with drawback. We're dealing with what is the specific tariff rate applicable to slab and then the exemption from that? What would be the benchmark? And here I think the 1% rate was actually... We're only concerned about all of this because we're in a drawback situation, right? They're saying you get back the 1% under the exemption or you get back the 5% or whatever it is. I don't understand your basis for an argument in a drawback situation that the tariff rates can't be countervail. But you would have to have a very particular situation where you had something to compare it against. What would the rate otherwise have been? Well, that's why I asked you about the basket provision. You seem to be fighting on that. But I don't quite understand what you mean by basket provision. If you meant anything made of steel... Everybody knows what basket provisions are. They're basket provisions in the UF tariff law. So if it doesn't fit into this category, it fits into the higher category. Higher category. I don't see the factual pattern for that, Connor. No, respectfully, I don't. All right, let's have rebuttal. We've given everybody lots of extra time. Mr. Garish, three minutes. May it please the court again. I'm Jeff Garish of Skadden Arps on behalf of the United States Steel Corporation. I'd just like to address a couple of points that were made by the government. On behalf of the Thai respondents. First of all, the government stated that what you have here is a government set rate. There's no market rates here and that you could not somehow construct a benchmark rate. Well, that just simply isn't the case, Your Honor. The Commerce Department routinely constructs benchmark rates under circumstances similar to those we have here. In fact, in the laminated women's tax case, there was the provision of land at less than adequate remuneration, which was provided by the government. There was no other rates, land use rates in effect during that time period other than the government rates. So what did they do? They constructed a benchmark rate. Is the problem here that we don't have any prior authority in the tariff area? Is that part of it? That is part of the problem here, Your Honor. And believe me, it's not from lack of searching for it. But there really has not been this type of situation in the tariff area where this has come up before. There's been other types of situations in which this has come up, including land use rates or stumpage rates, or we cited also to a Turkish pipe case in which there were subsidized loans. There was no applicable benchmark rate. So commerce went to the economist and constructed a benchmark rate. So clearly, that rate was not in effect either. That was something they constructed. Now, what has struck me here, both in the argument today and in the briefs, is commerce's approach and the Thai governments or Thai respondents are arguing, you know, there's just something, simply nothing we can do. We have to throw our hands up in the air and there's nothing we can do on this. And that leaves the US domestic industry totally defenseless on this point. And they said, you know, basically, we know what was in effect in 1999 and it makes no difference what else could have or would have applied. Well, the fact here is that that does leave us totally defenseless. And this is not consistent with what commerce has done in other contexts. They do construct benchmark rates to determine whether something is subsidized. You know, the fact here was slab was a primary product. And the slab, the import duty rate, was only temporarily reduced to 1%. They had to go through an application process. They changed the category though. They said, we're not going to treat it as a primary product anymore. We're going to treat it as a raw material, right? But in determining what... That's basically what happened. And they went through a process in which they determined that they would reduce it temporarily. Again, the Thai government has repeatedly said throughout this proceeding that it was a temporary reduction, that it was to return... You don't need to repeat what you tell us. Sure, I'm sorry. But the fact of the matter is that's what happened here. They temporarily reduced it to that rate. It was returned to the 5% rate as a normal, normal primary product. This was a special category that was created and it was only a temporary category. Are you saying that when they treated it in 1999 as distinct from 1998 under a different product category, that that was obviously fraudulent? Couldn't possibly fit in that new category? No, and we're not claiming that it was... Well, if it couldn't fit in either of two established categories and the Thai government says to itself, well, we made a mistake and put it in category A, but we think that actually fits a little better in category B, so we're not going to shift it to category B. That's what they did. What's wrong with that? Well, as I was starting to say, we don't think it's fraudulent in some way. We do think it was done to benefit the steel industry. And in fact, we think the record evidence does show that. Again, I hate to do this, but there is information on the confidential record here, which shows, which is... What page is that at? This is in the confidential joint appendix of pages 1285 to 1289. And you're saying it proves what? Well, Your Honor, I hesitate to go too far on this, but I think I would strongly urge you to take a look at that. I'm hesitant. I'm trying to figure out just whether you're resting your case on some evidence which you say shows bad intent, subjective intent of the Thai government. No, and there's no need to show bad intent. In fact, the countervailing duty laws is set up so that you don't have to show. That's what I thought. That's why I'm... No, and I'm sorry. I didn't mean to lead any confusion there. No, there is no need for intent here. All right. Well, I think we've given everybody more than ample time to explain their position. So we'll take the case under advisement. We thank all three counsel. Thank you, Your Honor. Thank you.